Our final case of the morning will be Appeal 23-2653, United States v. Miguel Salinas-Salcedo. And we'll hear from you first, Mr. Glausman. May it please the Court, Dean Glausman, on behalf of Miguel Salinas-Salcedo, I'd like to apologize to this Court briefly. When I was preparing for the argument, I was looking over my brief and appendix and I inadvertently attached the change of plea transcript instead of the sentencing hearing transcript, so I could supplement that for the record, if Your Honor's wish, but that was not in any sort  I think we have it stock at entry 200. Yes. Yeah, I think we've got it. Thank you. The appeal before this Court presents two issues. The first issue is the applicability of Section 2S1.1b2c and the second issue is whether the District Court made an adequate finding as to that enhancement applying to Mr. Salinas-Salcedo. For purposes of this oral argument, I'm just going to focus on the first issue, if that's right with this Court. If Your Honors have any questions about the second issue, I'm happy to answer them. Regarding the underlying facts, I don't believe there's any material disagreements here. The District Court found when it ruled against a two-point enhancement for leadership that Mr. Salinas was a middleman, the PSR said in paragraph 10 that he was a middleman, and the crux of this appeal here is that he was not the person who was actually engaged in the financial transactions that would clean the money in the money laundering conspiracy. Because of that, the review here is de novo, not clear error, because we're not really arguing with the facts. Overall, I think the facts are agreed upon. So what the issue here is, is does 2S1.1B2C apply to anyone who could be part of a conspiracy, or is it specifically related to someone who is engaging in the financial transaction to clean the money? And it's the government's position that that's not true, it could be anyone, and you look at the frequency of the transactions and the profitability of it. But if you look at the plain language of the guideline, if you look at the context of the guideline, if you look at the legislative history of the guideline, and the similar statute, not statute, similar applicability of being in the business of buying and selling stolen goods, it all points to the conclusion that you have to be the one who actually launders the money, not being a middleman or a broker, not a driver, not the drug dealer. And first, if you look at the non-exhaustive list of factors to consider under 2S1.1B2C, it gives the first four the specific ones, and number 1, 2, and 3 all say the defendant engaged in laundering funds. And you already know the definition of engaged, it's to involve oneself, to be a part of, and then in laundering funds is to make the transaction, so you're involved in making the transaction. And the fourth one, which is the last specific one before it goes into underlying convictions and things like that, it gives the context to this, and it says the defendant generated a substantial amount of revenue in return for laundering the funds. And here it's undisputed that Mr. Salinas did not launder the funds. There was a drug trafficking organization in Mexico, they had cash in the United States that needed to be laundered and wired back to Mexico, and he knew people who had access to banks or financial institutions that could wire the money back to them. In this case, it was two undercover officers that were working with the government. So he didn't actually do this. He got 1.5% for each transaction, which equaled, I think, about $44,000 out of the millions and millions that were laundered, and it was radically over two and a half years. But the main point here is if you look at the legislative history, this directs what we could do. Unfortunately, in this case, we don't have any guidance from case law, at least I couldn't find any, and I'm sure if the government could have found some that was against my position or in favor of theirs, they would have cited ours. It's kind of, it's empty across all circuits in this country. But the legislative history from 2001 when this enhancement was passed specifically says that this subsection, B2C, is for third-party money launderers, and exactly, it says, with respect to third-party money launderers, subsection B2C provides a four-level enhancement if the defendant is, quote-unquote, in the business of laundering funds. The commission determined that, similar to a professional, quote-unquote, fence, see section 2B1.1B4B, defendants who routinely engage in laundering funds on behalf of others and who gain financially from engaging in such transactions warrant substantial punishment. So it cross-references this other guideline that talks about being in the business of something, and it's the only one in the whole guideline book that talks about it. And the government, in their response brief, says, you know what, this whole fencing thing isn't an issue. The defense is kind of making that up. No, the commission specifically said this is what it's about. And in the context of buying and selling stolen goods, to be a fence, and this talks about in the United States versus the TOR and other cases, to be a fence, you receive or you buy stolen goods, and then you sell them as if they're not stolen goods, that they're legitimate goods. That's what makes it a fence. You take something illegal and make it seem like it's not illegal to some kind of purchaser. In order for that analogy to be equal in a money laundering aspect, defense is the person who launders it because they receive the illicit funds, they wire them or put them into their business and cut a check or whatever they do, and then they give someone what they report to be clean money. That's the fence. It's the person who does the specific financial transaction. And in this case, Mr. Salinas never did that. He never touched the money. He got paid a portion of what happened or what was transmitted, but that's it. Could he have been prosecuted as a leader in a better? He could. I mean, he was charged in a conspiracy. He pled guilty to conspiracy. But then that brings up a bigger issue because if anyone is convicted of a conspiracy under this idea that you could be held liable for any other enhancements, everyone in a conspiracy would get every enhancement the leader gets. So for example, in a drug trafficking conspiracy, if you have a leader who has his minions on the street selling drugs for him, and he also has a right-hand man who has no authority over those people but kind of helps him, he would get the leader to organize their enhancement too. Why is that? I mean, there are major players in conspiracy, minor players in conspiracies, people who are close to the core of the operation, people who aren't, but they're all in the conspiracy. The district court, at least, here made the judgment that your client was pretty close to the core. I mean, he made things happen. Well, he connected people, but he didn't aid and abet the actual transaction anyway. He didn't tell him how to do it or where to do it. He had no authority to say how much money was going to be transmitted, in what way, how it would be sent back, any of that. He got information from one side and passed it along to the other side, and when the other side had information, he passed it to the other side. For that, he got 1.5%. That's not aiding and abetting anything. That's brokering something. That's being a middleman, and that's exactly what he is. He didn't help the financial transaction in any way. He's not an employee of the bank or of the person who's transmitting the money. And if we get this broad view of everyone who's in a conspiracy that could be liable for it, then where does that stop? It's way too broad. For example, if you have a drug dealer who recruits an Uber driver, let's say, and says, hey, I need you to drive my drug money to this laundromat, and they're going to give you a check back of clean money to give it to me, and he does it for him over a course of two years for, let's say, 1%, is that driver then in the business of laundering funds? No, we can't say that. He's a driver. Mr. Salinas, he's a broker. And going back to this issue of offense that the commission specifically said this is akin to, he's not the fence. In this case, the UCs would have been the fence because they're the ones taking the illegal money, the illicit funds, the drug money, and wiring it to Mexico. They're fencing the money. He's not doing that. This isn't what it's for. And that's even why in the legislative history, the commission said this is for third-party money launderers. The direct money launderers are punishable under subsection B2A and B2B, where they get either plus one or plus two. The plus four is reserved for the third-party money launderers, and we can't say Mr. Salinas did that because he actually didn't do it. Would you like to reserve the remainder of your time for rebuttal? Yes. Very good. Thank you, Mr. Glossman. Mr. Morissette, we'll move now to you for oral argument on behalf of the government. May it please the Court, Wesley Morissette on behalf of the United States. The district court did not err in applying the four-level enhancement for being in the business of money laundering. Defendant pled guilty to conspiracy to commit money laundering. Defendant admitted that he was an integral part of the money laundering scheme. He admitted that he brokered 24 contracts to launder nearly $3 million in exchange for $44,000, and that he proposed 79 other contracts involving nearly $15 million more. He admitted that he knew the funds represented the proceeds of some form of unlawful activity and that the transactions were designed in whole or part to conceal those. And the district court's statement that he was a middleman or broker was addressing whether he was a leader in the scheme, not whether he was or was not a money launderer. The district court was very clear that his conduct fell under the money laundering statute. Though the defendant attempts to create some ambiguity in the statute, there is none. The four-level enhancement under the guideline 2S1B2C applies to money laundering statutes, the crime to which the defendant pled guilty. The term laundering funds is explicitly defined in application note one. It's defined as making a transaction, financial transaction, monetary transaction or transmission or transporting or transferring property funds or monetary instrument in violation 18 U.S.C. 1956. And 1956 says explicitly, for the purposes of this paragraph, a financial transaction should be considered to be one involving the proceeds of a specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity. Defendant has said that he was integral, does not deny that. And guideline 1B13 also explicitly states that in applying chapter two enhancement, the district court is to consider all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, and willfully caused by the defendant. The analysis under application note four thus necessarily focuses on the extent and the frequency to which the defendant engaged in money laundering conduct, not whether that conduct meets the definition of money laundering. Even looking at the fence test as the defense wants to rely on, that fence test supports applying the enhancement here. The fence test is designed to punish more harshly the fence who connects the stealer, the thief of stolen goods, and the buyer of stolen goods because that fence encourages continual criminal conduct. That's exactly what the defendant did here. The defendant found people who had money that needed to be laundered and was part of that scheme to get that money laundered through other individuals. These transactions do not happen without the defendant linking these two parties together. If the panel has no further questions, we just ask that panel affirm district court sentence. Thank you very much, Mr. Morissette. Mr. Glassman, we'll move now back to you for rebuttal argument. As you already know, in order for a sentencing enhancement to apply or whatever sentence is going to be handed down, it has to be an individualized assessment. You don't look at what happened in the entire conspiracy. You don't look at what everyone did in the conspiracy. You look at what an individual did. Now, what did Mr. Salinas do here? He did not sell the drugs to get the money. He did not say how much money he needed laundered. He didn't say when he needed it laundered. He didn't say what financial institution to do it through. He had no connections in the financial institution to do it. He didn't determine how much of a cut was going to be given to anyone. All he did was connect two people and pass along information. And with that, just because he's an integral part doesn't mean every enhancement applies to him. There has to be a narrower view because if you get overbroad, then you don't know where it stops. Who doesn't get this enhancement? The government's view is, you know what, if you do it a lot and you make some money doing it, this enhancement applies. That's not what the commission wanted. They specifically said that when they passed it through their notes saying it's akin to offense. And by the addition of offense, a broker is not offense. The offense is the one exchanging it from dirty to clean, whether it's stolen goods or money. And Mr. Salinas did not do that, and this should not apply to him. Thank you, Your Honor. Thank you very much, Mr. Glassman. Thank you very much, Mr. Morissette. The case will be taken under advisement.